**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| V. | * | Criminal No: 1:18-CR-00059-003 |
| | * | Plea Date: April 16, 2019 |
| **BRIAN JENKINS** | * | Judge: Richard J. Leon |
| | * | |
| Defendant(s). | * | |
| | * | |

## EMERGENCY MOTION FOR RELEASE FROM CUSTODY DUE TO IMMEDIATE THREAT POSED BY COVID-19 PANDEMIC

**COMES NOW**, Defendant, **BRIAN JENKINS**, by and through John O. Iweanoge, II and THE IWEANOGES FIRM, PC, his attorneys, respectfully moves this Court pursuant to the Fifth and Eighth Amendments to the United States Constitution, for immediate release from the custody of the D.C. Department of Corrections (DDOC). The close contact and conditions of incarceration are unsafe in light of the global pandemic that has, as of March 11, 2020, been declared by the World Health Organization (WHO). On March 13, 2020 the President of the United States, also declared COVID-19 a National Emergency. These conditions pose a substantial risk of serious illness and possible death to Brian Jenkins. Under these unique circumstances, the Court must release Brian Jenkins, at least until the resolution of this outbreak.

In support of this Motion counsel states:

1.    Brian Jenkins entered a guilty plea to Count One of the superseding indictment charging conspiracy to distribute and possess with intent to distribute 28 grams or more of cocaine base and a detectable amount of cocaine. He has been detained pursuant to 18 U.S.C. 3142 since March 15, 2018. Ms. Ashley has been detained at the DC Jail for the entirety of his pretrial detention.

2.     On March 11, 2020, the World Health Organization declared a global pandemic based on the coronavirus, or COVID-19.  Citing "deep[] concern[] both by the alarming levels of spread and severity, and by the alarming levels of inaction," it called for countries to take "urgent and aggressive action."

3.     On March 11, 2020, Mayor Muriel Bowser declared a Public Health Emergency in the District of Columbia. She issued an Order identifying COVID-19 as an imminent threat to the health, safety and welfare of D.C. residents, requiring emergency protective actions to be taken by the D.C. Government.

4.     COVID-19 is an infectious disease caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), a virus closely related to the SARS virus. In its least serious form, COVID-19 can cause illness including fever, cough, and shortness of breath. However, for individuals who become more seriously ill, a common complication is bilateral interstitial pneumonia, which causes partial or total collapse of the lung alveoli, making it difficult or impossible for patients to breathe. Thousands of patients have required hospital-grade respirators, and COVID-19 can progress from a fever to life-threatening pneumonia with what are known as "ground-glass opacities," a lung abnormality that inhibits breathing.

5.     As of April 22, 2020, over 2,625,657 people in 180 countries have been diagnosed with coronavirus and 183,026 people have died as a result.  And as of April 22, 2020, 852,996 people have been diagnosed in the United States, with 47,703 deaths confirmed. All 50 states and the District of Columbia have confirmed positive tests.

6.     The number of people infected is growing exponentially. Reported new cases as of April 22, 2020 is 76,357 with 6,445 new deaths according to the Kaiser Family Foundation.

7. It is also clear that, currently, the numbers of people diagnosed reflect only a portion of those likely infected; very few people have been tested, and many are asymptomatic, so they don't even know they should be tested. As a result, thousands of people are likely living day to day and carrying a potentially fatal disease that is easily transmitted – and no one is aware of it.

8. The current estimated incubation period is between 2 and 14 days, meaning that a patient who begins showing symptoms today may have been contagious for as long as two weeks prior. The current estimated rate for life-threatening complications is approximately 20%, with a fatality rate estimated at between 1% and 5%. All of these risk assessment numbers, however, appear to be rising.

9. The District of Columbia has, as of April 22, 2020, 3,361 diagnosed and 139 dead of COVID-19 that have been confirmed by the Department of Forensic Science and the Mayor's Office. The District has also notified hundreds of individuals that they may have been exposed in community-based settings such as churches and political rallies, and recommends self-quarantine for those individuals. In the last few weeks, many nations have declared lockdowns, and cities and institutions across the United States are closing public events, workplaces, and schools.

10. The virus is thought to spread mainly between people who are in close contact with one another (within about 6 feet) through respiratory droplets produced when an infected person coughs or sneezes. It also may be possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes. What doctors and experts are calling "community spread" is at the root, and "social distancing" is being enforced as the best method of prevention. Social distancing means, in essence, isolating oneself from other people as much as possible: working from home, avoiding travel, avoiding

crowds and contact with others, not touching common surfaces, and generally staying at least 6-12 feet from other people as much as possible.

11. On March 11, 2020, a study was submitted for peer review suggesting that the COVID-19 virus is airborne, and can remain viable in the air for up to three hours after becoming aerosolized. The virus can get into the air when someone who is infected, even if they are asymptomatic, breathes, coughs, or sneezes, or if their bodily fluids are released into the air. The study also confirms earlier reports that the virus can remain active and transmissible on plastic, metal, and other surfaces for up to three days.

12. The Centers for Disease Control (CDC) National Center for Immunization and Respiratory Diseases has issued recommendations for safety precautions that individuals and communities should take to lessen the further spread of the illness and to protect oneself from contracting it. Among those measures are face mask, frequent, thorough hand-washing, avoiding touching one's own face or other people's faces, the use of alcohol-based hand sanitizers when soap and water are not available, frequent cleaning with antiseptic cleansers of frequently touched items and surfaces, and social distancing.

13. D.C. DOC's own employee screening form for COVID-19 defines "close contact" with someone diagnosed with or under investigation for possible COVID-19 as "approximately 6 feet" *or* "within the room or care area for a prolonged period of time without wearing recommended personal protective equipment (gowns, gloves, respirator, eye protection)" *or* "having direct contact with infectious secretions (e.g., being coughed on) while not wearing recommended personal protective equipment."  Most cases of COVID-19 are likely currently undetected, so the numbers of people who are diagnosed or under investigation are unreflective of who is actually carrying the infection.

14. Another main preventive tool is disinfection of surfaces and spaces around oneself. The CDC distinguishes between cleaning and disinfecting, and recommends that all surfaces that are touched frequently – doorknobs, light switches, countertops, handles, desks, phones, faucets, keyboards, toilets and sinks – be both cleaned *and* disinfected at least daily.

15. It is virtually impossible to engage in these basic preventive measures, as urged by the CDC, when incarcerated at the D.C. Jail and CTF. The DDOC is incapable, due to its correctional, rather than medical, mission, of meaningfully following the CDC's guidance. Indeed, jails and prisons are generally at grave risk due to their inherent structure and mission, for the transmission of infection.

16. People incarcerated at the DDOC facilities in Washington, D.C., are:

   a. Housed in cells that generally hold more than one person, meaning that beds and living space are in close quarters, and unable to choose otherwise;

   b. Near-constantly in communal spaces, such as eating areas, bathrooms, and cells or holding areas, and unable to choose otherwise;

   c. Living in spaces with open toilets within a few feet of their beds, meaning that infection-transmitting fecal and other matter is not contained, and that bodily fluids that could contain viruses are aerosolized into the air inside the cell every time either person in the cell uses the toilet, and unable to access a closed toilet that would not aerosolize bodily fluids into their living spaces;

   d. Near-constantly in "close contact" with others, nearly all of whom have not been tested for COVID-19, and unable to choose otherwise;

    e. Frequently in actual physical contact with others, such as correctional officers, kitchen staff, and medical staff, many of whom have not been tested for COVID-19, and unable to opt out of this contact;

    f. Subjected to frequent intimate contact by correctional staff, many of whom have not been tested for COVID-19, during searches of their person, including having those staff place their hands inside of people's mouths and other body cavities;

    g. Lacking regular, uninhibited access to soap, water, tissues and paper towels, and the jail commissary, upon information and belief, does not stock antiseptic soap;

    h. Lacking access to hand sanitizer that complies with the CDC's guidelines of being over 60% alcohol, as it is considered contraband and prohibited inside the DDOC facilities.

17. People in DDOC facilities also lack access to quality, efficient medical care. Although an incarcerated person can fill out paperwork asking to see a member of the medical staff, those slips take at least a day, and sometimes more than a week, to process. Between the time when someone asks to see a medical professional and the time the person is actually seen to be assessed for crucial symptoms such as fever or breathing problems, nor only could their condition become critical, but they could infect their cellmate or anyone else they came into contact with. Further, Patients at CTF are treated by medical staff supervised by medical doctors, but who are themselves not doctors, much less infectious disease specialists, internists, pulmonologists, or emergency medical specialists.

18.     This combination of lack of adequate sanitation, close quarters, and limited medical capacity has created the perfect storm that has put people at greater risk of mortality as they are held in custody at a time when COVID-19 has now entered the facility. As of April 22, 2020, an inmate has died at DC Jail from COVID-19, and dozens of inmates have tested positive for coronavirus.

19.     Brian Jenkins is 44 years old and in poor health. He was diagnosed with diabetes in 2019 and with hypertension in 2018. DC Jail records indicates that he is prescribed Metformin HCL 1000mg and Hydrochlorothiazide 25mg. (See ECF Document No. 146). These two health conditions puts Brian Jenkins in the high risk category according to the CDC guidelines, with a higher fatality rate if he is infected with COVID-19, which is only a matter of when, not if as DC Jail is infected.

20.     Isolation, segregation or attempted lockdown, for the above reasons, are largely futile in the face of the COVID-19 pandemic.  COVID-19 can survive in the air, so separation in a facility where there is still other movement of people, and occasional interaction, will not contain it.  The number of people moving in and out every day alone creates a risk for someone who is trapped inside and cannot self-protect elsewhere.  Further, the reality is that some contact with others – in close proximity and actual contact – is inevitable. Kitchen staff, intake staff, officers and medical staff all interact with incarcerated people as a matter of course.  Additionally, growing research demonstrates the permanent damage to people done by solitary confinement and isolation within correctional facilities, making attempted containment by isolation an unacceptable – and incompatible – path to pursue toward safety and health.

21. For all of these reasons, Troy Ashley's constitutional rights, health and safety, and potential mortality are threatened by his incarceration, and this Court should release him from custody. Neither CDF nor CTF are equipped to protect his safety and health.

22. Brian Jenkins can be released with electronic monitoring with GPS into the HISP and residing with his brother, Ron Jenkins 7506 Georgian Drive, Upper Marlboro, MD 20772.

23. The Due Process Clause, rather than the proscriptions of the Eighth Amendment against cruel and unusual punishment, governs the validity of the conditions and restrictions of confinement for detainees charged with crimes but not yet convicted. *See Brogsdale v. Barry*, 926 F.2d 1184, 1188 (D.C.Cir.1991). Because the due process rights of a pretrial detainee "are at least as great as the Eighth Amendment protections available to a convicted prisoner," *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983), a pretrial detainee's rights are violated if he is "incarcerated under conditions posing a substantial risk of serious harm" and the detaining official's "state of mind is one of 'deliberate indifference' to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal citation omitted); *see, e.g.*, *Hardy v. District of Columbia*, 601 F.Supp.2d 182, 190 (D.D.C.2009) (violation of constitutional rights of pretrial detainee if the officials "knowingly disregarded a substantial risk of serious harm of which they were aware"). To show deliberate indifference, "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842.

24. Despite issuing self-reporting screenings to employees and, upon information and belief, some visitors upon entering its facilities, the DDOC has not – and cannot – come close to meeting its obligations to protect those in its custody. The current situation calls for, in addition to a variety of internal protective measures (including testing, disinfecting, and increasing bodily autonomy to protect oneself), considering the release of people in custody to decrease exposure

for everyone, and to ease the burden on staff and medical personnel. In U.S. District Court cases involving the DC Jail, since the COVID-19 emergency inmates have been temporarily released on home confinement because of the serious and fatal health risks posed by COVID-19. Upon information and belief, DDOC is not engaged in consideration about whether some people can and should be released.

25. Despite the substantial risk of harm, officials have not yet acted. Based on their knowledge of the inner workings of their facilities, DDOC officials should be seeking the release of people from the courts or from public officials. And public officials should be actively engaged in reducing the number of people inside the facilities. Pursuant to the Eighth Amendment and the Due Process Clause, undersigned counsel implores this Court to act and to immediately release Brian Jenkins from DDOC custody.

26. A judge in a criminal case may decide a constitutional issue affecting the administration of justice in that particular case, including one concerning the conditions of the defendant's confinement. *United States v. Medina*, 628 F. Supp. 2d 52, 55 (D.D.C. 2009). In *United States v. Medina*, then-Chief Judge Lamberth held that the District Court had jurisdiction to consider a motion by defendants detained pretrial at the D.C. Jail who challenged the Department of Correction's classification policies, which were preventing them from adequately reviewing discovery and consulting with counsel. *Id*. Writing that the defendants' motion was not "'some sort of informal habeas petition,'" and that "[i]nstead, the defendants have raised claims based on the Constitution and their status as pretrial detainees in a criminal case," the district court held that it was "certainly not prohibited from remedying constitutional violations that infect its administration of criminal justice" and thus could resolve the claims. *Id*. at 55. The district court suggested that it while it would normally not be concerned with the "day-to-day administration of

detention facilities," it would be necessary to remedy the situation when the Department of Corrections "hampers an inmate's ability to access counsel, discovery, or unlawfully punishes an inmate prior to conviction." *Id*. at 54-55. The Court noted, "DOC should . . . be mindful of the fact that the Court must safeguard a pretrial detainee's constitutional rights . . . ." *Id*. In addition to endangering his life and health, the growing pandemic – and reduced staffing, visitation and access to assistance that is additionally the result of precautions being taken by those *not* incarcerated – hampers Brian Jenkins' ability to review and discuss his case materials, engage in communications with people inside and outside the facility, and make thoughtful decisions in preparation for trial.

27.     Even if the Court construes this Motion as a habeas petition, the Court should rule on the merits of the claims without requiring a separate filing. This was the approach taken by Judge Collyer in a D.C. Jail conditions challenge. *United States v. Rojas-Yepes*, 630 F. Supp. 2d 18, 21 (D.D.C. 2009) ("[T]he Court will construe [Mr. Rojas-Yepes'] pending Motion to Modify Jail Conditions as a habeas petition, inasmuch as a district court certainly has 'jurisdiction to entertain a habeas petition challenging the conditions of pretrial confinement.'" (quoting *United States v. McGriff*, 468 F. Supp. 2d 445, 447 (E.D.N.Y. 2007)).

28.     18 U.S.C. § 1342 governs detention prior to trial. Courts must find by clear and convincing evidence that no condition or combination of conditions will reasonably assure the appearance of a person as required, and the safety of any other person and the community, before removal from their home and community. Among the specifically enumerated factors the courts must consider when making this determination is a consideration of "[t]he nature and seriousness of the danger to any person or the community that would be posed by the person's release."

29.     Here, release *enhances* the safety of other people and the community. Indeed, it is the incarceration that is dangerous in the context of the COVID-19 pandemic. It is safer for other

10

people in the jail, for the staff of the jail, for lawyers and court personnel, and for the community well beyond that, if Brian Jenkins is able to exercise self-protective measures in a sanitary, disinfected space, and to maintain the type of social distance that other community members are now engaging in. Release will reduce the risk that he or anyone else transmits or receives the infections. When Brian Jenkins was initially detained, circumstances were different; this Court must now consider a very different reality than the Court did in March 2018.

30. Brian Jenkins' continued detention at the D.C. Jail violates the Due Process Clause of the Fifth Amendment, and he should be immediately released with the appropriate conditions, if necessary. Further, this Court can consider temporary release until both the resolution of this global health crisis and the creation of safe and constitutionally compliant conditions inside the facility.

**WHEREFORE**, for the reasons stated above, as well as any other reasons that become apparent to the Court, Brian Jenkins respectfully requests that the Court grant this Motion and order his release by the DC Department of Corrections.

Respectfully submitted,

THE IWEANOGES FIRM, PC

By: ____/S/JohnOIweanoge/S/_____
John O. Iweanoge, II
IWEANOGE LAW CENTER
1026 Monroe Street, NE
Washington, D.C. 20017
Phone:  (202) 347-7026
Fax:    (202) 347-7108
Email:  joi@iweanogesfirm.com
Attorneys for Defendant

Brian Jenkins
Defendant by Counsel

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 27th day of April, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Christopher Macchiaroli, AUSA
Kevin L. Rosenberg, AUSA
United States Attorney's Office
for the District of Columbia
555 4th Street, NW
Washington, DC 20530


Dated: 27th day of April, 2020.        /S/JohnOIweanoge/S/
                                          John O. Iweanoge, II

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| V. | * | **Criminal No: 1:18-CR-00059-003** |
| | * | **Plea Date: April 16, 2019** |
| **BRIAN JENKINS** | * | **Judge: Richard J. Leon** |
| | * | |
| Defendant(s). | * | |
| _____ | * | |

# ORDER

**UPON CONSIDERATION** of this Emergency Motion for Release from Custody due to Immediate Threat Posed by COVID-19 Pandemic, and any State's opposition thereto, it is this _____ day of _____, 2020, hereby;

**ORDERED**, that on this _____ day of _____, 2020 that the Department of Corrections must release Troy Ashley from its custody.

**FURTHER ORDERED**, _____

_____.

**SO ORDERED.**

                                                                                              _____
                                                                                              Richard J. Leon
                                                                                              U.S. District Court Judge

Copies sent to:

cc:   John O. Iweanoge, II                           Christopher Macchiaroli, AUSA
        THE IWEANOGES FIRM, P.C.            Kevin L. Rosenberg, AUSA
        IWEANOGE LAW CENTER                 United States Attorney's Office
        1026 Monroe Street, NE                    for the District of Columbia
        Washington, DC 20017                     555 4th Street, NW
                                                                   Washington, DC 20530