**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    :
UNITED STATES OF AMERICA          :          No. 18-cr-59-3 (RJL)
                                                    :
                                                    :
v.                                                 :
                                                    :
BRIAN JENKINS,                          :
                                                    :
                       Defendant.         :
_____:

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## EMERGENCY MOTION FOR RELEASE

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully submits this opposition to the defendant's EMERGENCY

MOTION FOR RELEASE FROM CUSTODY (ECF No. 182). For reasons stated below, the

government submits that the motion should be denied. In support, the government relies on the

following factual and legal authority, as well as any that may be offered at a hearing on these

motions.

## PROCEDURAL HISTORY

A grand jury sitting in the District Court for the District of Columbia returned an indictment

against Defendant Jenkins on March 13, 2018 charging him with conspiring to distribute 28 grams

or more of cocaine base in violation of Title 21, United States Code, Sections 841(b)(1)(B) and

846 (ECF Doc. 1). Agents with the Federal Bureau of Investigation ("FBI") arrested Defendant

Jenkins on March 15, 2018 (ECF Doc. 6). A grand jury returned a superseding indictment against

Defendant Jenkins on March 20, 2018 charging him with the additional count of carrying a firearm

during a drug trafficking offense in violation of Title 18, United States Code, Section 924(C) (ECF

1

Doc. 22). Magistrate Judge Meriweather ordered Defendant Jenkins held without bond pending

trial on March 23, 2018 (ECF Minute Order March 23, 2018). Defendant Jenkins entered a guilty

plea to one count of conspiracy to distribute 28 grams or more of cocaine base, in violation of Title

21, United States Code, Sections 841(b)(1)(B) and 846 on March 16, 2019 (ECF Docs.131-134).

Defendant Jenkins admitting the following, under oath, during the plea agreement hearing:

> From September 2017 through my arrest on March 15, 2018, I, Brian Jenkins, supplied cocaine base (crack) to Darnell Catlett and the quantity of crack was at least 140 grams. In this capacity, I also assisted Darnell Catlett with the cooking of powder cocaine into crack, including, when Darnell Catlett received a kilogram of cocaine in October of 2017. I knew at the time that Darnell Catlett was selling the majority of this crack inside of the District of Columbia at a residence in Northeast, Washington, D.C.
>
> On at least one occasion I traveled with Darnell Catlett into the District of Columbia as part of this conspiracy. This was on September 26, 2017. At approximately 5:11 a.m., Darnell Catlett sent me a text message that stated "Soft for russ." At approximately 2:19 p.m., I drove to the area of the Wah Mee & New China restaurant located at 1604 Rhode Island, Avenue, Northeast and brought a resale amount of cocaine with me. Once I arrived, I parked my car and met with Darnell Catlett and Russell Harrison for the purpose of providing them with cocaine. On this date, I did provide them with cocaine.
>
> On March 15, 2018, I was residing at 3511 Windom Road, Apartment 10, Brentwood, Maryland 20722. On that day, inside my residence, where I was arrested, I had: (i) approximately 32.5 grams of powder cocaine; (ii) a Kahr CW9 9mm handgun bearing serial number YE3258; (iii) fourteen Luger 9mm rounds of ammunition; (iv) two magazines; (v) drug paraphernalia, to include, two digital scales, a strainer, baking soda, and a Pyrex glass, all which was used to manufacture powder cocaine into crack; and (vi) $12,900 in U.S. currency. These items all belonged to me and possessed them as part of the drug trafficking agreement with Darnell Catlett and others.

The government filed a sentencing memorandum on June 23, 2019 (ECF Doc. 149).

Defense Counsel filed a sentencing memorandum on July 8, 2019 (ECF Doc. 155). The court

granted a sentencing continuance motion on July 16, 2019. The parties requested a replacement sentencing date on July 21 2019 (ECF Doc. 159). The Court scheduled a sentencing for September 18, 2019. The Court vacated this date on September 16, 2019. The parties have not set a new date to sentence Defendant Jenkins. Jenkins filed a motion for release on March 28, 2020 (ECF Doc. 182).

## ARGUMENT

A defendant must be detained pending trial, if the Court determines that no condition or combination of conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). A court may reconsider its decision regarding pretrial detention "at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time and that has a material bearing on the issue" of whether there exist conditions for release that would "reasonably assure the appearance of such person as required." *United States v. Bikundi*, 73 F. Supp. 3d 51, 54 (D.D.C. 2014) (citing 18 U.S.C. § 3142(f)(2)(B); accord *United States v. Moore*, No. 13–330, 2014 WL 1273439, at *1 (D.D.C. Mar. 31, 2014)).

Once a defendant has been found guilty of a crime – like here – the governing statute shifts to section 3143.

According to 18 U.S.C. § 3143(a)(1), a person shall be detained after having been found guilty of an offense, unless a judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety or any other person or the community if released under section 3142(b) or (c). Defendant Jenkins entered a guilty plea, accepted by the Court. Therefore, the defendant should be detained under Section 3143(a)(2).

Additionally, 18 U.S.C. § 3145(c) provides that a person may be released, under specific circumstances, if it is "clearly shown that there are exceptional reasons why such's person's detention would not be appropriate."[1] Assuming *arguendo* that Section 3145(c) does grant district courts authority, it provides that a defendant subject to detention under Section 3142(a)(2) may nonetheless be released if the defendant 1) shows by *clear and convincing* evidence that he is not a flight risk or a danger to any other person or the community *and* 2) "if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate." 18 U.S.C. Section 3145(c) (emphasis added). If the Court were to find that §3145(c) acts as a possible safety-valve, the reasons proffered by the defendant, at this stage and time, do not warrant "exceptional reasons." Defendant's conduct is serious and the type that posed and poses a risk to the community

---

[1] Courts are divided on whether 18 U.S.C. § 3145(c) also applies as a safety valve in this circumstance or is only applicable to the courts of appeal on appeal, and the D.C. Circuit has not opined on the issue. *See United States v. Briggs*, 577 F. Supp. 2d 435, 436 (D.D.C. 2008) (discussing lack of opinion from the D.C. Circuit); *United States v. Chen*, 257 F. Supp. 2d 656, 659 (S.D.N.Y. 2003) (compiling and discussing cases from multiple jurisdictions on the issue); *But see United States v. Warren Boyd*, 19-cr-292 (JDB) (finding the Court could utilize subsection (c)); *United States v. Harris*, Case No. 19-356 (RDM) (ECF No. 35) (D.D.C. March 25, 2020) (the same). The majority of district courts that have addressed the issue appear to have found that 3145(c) does apply in the present circumstance, and *United States v. Castro*, 2016 WL 3446660 (E.D. Pa. 2016) is particularly instructive. As *Castro* points out, 3145 (a) and 3145(b) are entitled "Review of a Release Order" and "Review of Detention," whereas subsection C is entitled "Appeal from a Release or Detention Order." The title of 3145(c) itself indicates that 3145(c) is intended to apply to and govern appeals from the detention or release order to a court of appeals (as opposed to (a) and (b), which are intended to govern the district court's review of a magistrate judge's release or detention order), because the district court here issued the detention order at the time of the plea and "by definition, a court cannot hear an appeal from its own order." *Id.* Moreover, the text of 3145(c) further clarifies that it intends to apply to the court of appeals, as it states that its procedure is "governed by the provisions of section 1291 of title 28 and section 3731 of this title," two provisions expressly applicable to the courts of appeal and not the district courts.

at large. Defendant Jenkins agreed that he was accountable for 140 grams of cocaine base, also known as crack, and 1032.5 grams of cocaine and that his conduct involved a firearm.

The defendant's motion for release is supported by his health conditions. He is receiving medication and treatment for these conditions at the DC Jail.

The Bail Reform Act requires the judicial officer to assess various factors, as described below, before releasing or detaining a defendant. 18 U.S.C. § 3142(g). The determination that a criminal defendant must be detained pursuant to subsection (g) "may be reopened" at any time prior to trial if new information surfaces that has a material bearing on the potential conditions of release that may reasonably assure the defendant's appearance in court and the safety of the community. 18 U.S.C. § 3142(f). Section 3142(i) also provides a distinct mechanism for temporarily releasing a detained defendant, in a manner that does not revisit the initial bond determination, but rather if a court finds that such release is "necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). Before turning to the defendant's claim that the COVID-19 is a compelling basis to authorize release, we first assess the §3142(g) factors as they apply to this case:

     *a.  Nature and Circumstances of the Offense*

Defendant Jenkins faces a mandatory minimum sentence of 60 months incarceration. His offense involved more than 140 grams of cocaine base, also known as crack, and 1032.5 grams of cocaine. On the day of his arrest, FBI agents seized, from his home, approximately 32.5 grams of powder cocaine, a Kahr CW9 9mm handgun bearing serial number YE3258; fourteen Luger 9mm rounds of ammunition; two magazines; drug paraphernalia, to include, two digital scales, a strainer,

baking soda, and a Pyrex glass, all which was used to manufacture powder cocaine into crack; and $12,900 in U.S. currency.

### b. Weight of the Evidence

The evidence in this case was overwhelming. Wire intercepts captured the defendant discussing narcotics transactions. FBI agents arrested the defendant at his home and he possessed drug trafficking paraphernalia, a firearm, and a large amount of US currency. Moreover, Defendant Jenkins admitted his guilt to this offense before the Court.

### c. History and Characteristics

Defendant Jenkins has one prior conviction from 1996 involving narcotics (ECF Doc. 156, at ¶ 45). Defendant Jenkins has several additional unprosecuted law enforcement contacts (ECF Doc 156, at ¶ ¶ 46 – 61).

### d. Danger to the Community

Defendant Jenkins posed a danger to the community with his firearm possession and involvement in a large-scale drug trafficking organization. Releasing Defendant Jenkins would place this danger back into the community.

Respectfully, the factors have not changed, and if anything, reminds the Court of the defendant's danger if released. *See* 18 U.S.C. § 3142(g)(4) (requiring the Court to first evaluate "the danger" that "would be posed by the person's release.")

Given these decidedly important factors, the question now turns to what weight to give to the public health crisis that the world currently faces, and how such a crisis should affect this Court's decision to detain the defendant.

**II.      While the COVID-19 pandemic is dangerous, it is not a changed circumstance that necessitates reconsideration of bond at this time.**

Section 3142(i) operates independently of the detention factors. Under 3142(i), the Court could release a defendant temporarily to the custody of another if it finds a "compelling reason" that necessitates temporary release. Respectfully, the existence of the pandemic in and of itself is not a compelling reason to justify release. Moreover, according to the D.C. Department of Corrections (DOC), DOC appears to be have undertaken several steps to try to prevent the spread of COVID-19 within its facilities.

The only real basis for the defendant's request for release is the existence of the COVID-19 pandemic. While the COVID-19 pandemic is obviously startling, the government still has a duty to ensure the safety of the community and balance the security of others with the safety of the defendant. In other words, unless this or any court is willing to release all defendants, or defendants with verified vulnerabilities, regardless of their danger and/or risks, the Bail Reform Act still provides a meaningful framework to analyze the defendant's motion. As described earlier, the defendant's chief argument is that he has diabetes and hypertension and thus, he needs to be released. As noted in the pre-sentence report, Defendant Jenkins is receiving medication and treatment for these conditions (ECF Doc. 156, at ¶71).

As this Court is likely aware through prior filings, the government has endeavored – on a case-by-case basis and as a result of the public health crisis currently pending – to permit temporary release pursuant to 18 U.S.C. § 3142(i) or 18 U.S.C. § 3145(c) to those who actually need release.[2]

---

[2] For example, in *United States v. Carl Courtney*, 19-cr-413 (TJK), the government consented to release where the defendant had open wounds and was scheduled for surgery. In *United States v. Larry Key*, 19-cr-292 (JDB), the government consented to release due to the defendant's advanced age, his lung, heart, and kidney disease, and current multiple hospitalizations. The government is

Here, it is unclear as to how any of the circumstances cited in his motion, in this context, at this time, and with this charge, necessitates release under these circumstances. Furthermore, the defendant has not offered any rationale for why release into a community that is already affected by the virus will protect either individual any more than their current placement at the Department of Corrections.

### The D.C. Jail

In preparing to respond to these and other similar motions, the United States Attorney's Office has consulted with DOC to obtain relevant information as to its handling of the public health crisis, and passes this information along to the Court for its consideration. Indeed, this office continues consulting with the DOC in light of the rapidly-changing situation. Based upon the information provided to the government at present, it appears that DOC is handling the situation as well as it can – no different than any organization in the United States that is trying to weather this pandemic.

Specifically, as of March 27, 2020, according to DOC, DOC has done (and continues to do) the following to ensure the safety of its incarcerated population:

- banned all non-attorney visits to limit unnecessary exposure;

- implemented screening processes for all visitors and incoming inmates, including attorneys and staff; such screening includes assessing visitors and inmates for symptoms, sanitizing stations, etc.;

- if incoming residents at a DOC facility fail the screening process, they are given a mask and taken to medical to determine if they require further hospitalization or testing. Moreover, if there is concern that an inmate has COVID-19, the inmate will

---

sincerely trying to balance the danger of the offender and the pandemic, but cannot ignore a person's record, their conduct, or their alleged or unverified maladies.

be placed into a single cell in a specialized unit, where the inmates only contacts are with medical staff, who will obtain COVID-19 testing within 3-4 days;

- DOC has implemented an incident command program, where each day, DOC units meet to discuss ongoing processes to combat the virus;

- DOC sends out daily reminders to its staff about taking preventative, prophylactic measures to avoid infection, such as washing hands, using sanitizer, etc.;

- DOC has constant meetings with the D.C. Department of Health to ensure its procedures meet both local and national standards, to include following updated recommendations of the Centers for Disease Control;

- DOC has continued to engage with the USAO and the local Public Defender Service to ensure continuity of operations;

- DOC checks and rechecks its ventilation system to ensure the air quality in the facilities;

- DOC is tracking and ordering additional cleaning and sanitation kits (for example, as of March 17, 2020, the D.C. jail had 55,200 bars of fresh soap, which it dispenses weekly to each inmate), as well as protective gear and it has mandated cleaning at its facilities every two hours;

- DOC would like to limit the number of inmates coming into its facility at any given time[3]; and

---

[3] Law enforcement partners have put in place procedures to reduce the number of individuals subject to custodial arrest, exercising their authority to issue citations for individuals to appear on a future dates. *See e.g.*, Metropolitan Police Department Order EO-20-011, *Coronavirus 2019 Modification to Citation Release Criteria* (effective March 17, 2020) ("[T]he USAO and OAG have exercised their authority under DC Code § 23-584(c) to categorically approve the citation release of arrestees consistent with the following updated criteria during the COVID-19 emergency. . ."). Additionally, on March 27, 2020, with the consent of the U.S. Attorney's Office and others, the Chief Judge issued an order regarding the suspension of the execution of bench warrants in certain misdemeanor cases and an order suspending all sentencing provisions requiring service of sentence on weekends.

Additionally, the inmate populations at CDF and CTF appear to be well below the figures prior to the outbreak of the pandemic. According to a report issued by the Office of the District of Columbia Auditor on Feb. 28, 2019, which was attached as an exhibit to PDS's motion for a Temporary Restraining Order filed in *Banks v. Booth,* Case 1:20-cv-00849-CKK (D.D.C. Mar. 30, 2020), as of June 2018, the average daily populations at CDF and CTF were 1346 and 692, respectively. According to the DOC census distributed to the Criminal Justice Coordinating

- upon information and belief, DOC has the capacity to quarantine near 100 inmates, although that number is fluid and subject to change.

*See also* Coronavirus Prevention, D.C. Department of Corrections (March 27, 2020), https://perma.cc/L59Z-WG43 (explaining how DOC has suspended in-person visitations, enhanced cleaning efforts, ordered additional sanitation supplies, and diminished out-of-cell recreational time in response to the threat of COVID-19).

As this Court knows, the D.C. Public Defender Service and the D.C. American Civil Liberties Union sued DOC in the U.S. District Court. That case is stylized as *Banks v. Booth* and is assigned to Judge Collen Kollar-Kotelly. The plaintiffs alleges various failures by the DOC to protect its inmates.

On April 1, 2020, DOC responded to the claims and provided additional information for the Court to consider, including all relevant written procedures and practices concerning COVID-19, particularly related to legal visits and communication. 20-cv-849, ECF No. 19. We have attached the available protocol to this filing (Attachment 1). On April 3, 2020, DOC filed its opposition to the plaintiff's application for a temporary restraining order.[4] *See Banks v. Booth*, 20-cr-849-CKK, ECF No. 25 (Attachment 2). In addition, the government directs the Court to

---

Council (CJCC), the inmate populations as of February 29, 2020 (prior to the crisis) were 1242 at CDF and 540 at CTF, and on April 3, 2020 (following three weeks of measures in response to the crisis) were 1097 at CDF and 448 at CTF. In other words, the current jail populations at CDF and CTF are down approximately 18% and 35%, respectively, since the June 2018 average, and down approximately 11% and 17%, respectively, since the end of the month prior to the crisis.

As of April 7, 2020, that number has decreased further, by appropriate fifty inmates.

[4] Based on this opposition, there is clearly a material dispute of fact and law.

additional documents filed in that active litigation, including: ECF No. 20-1 (Declaration of Lennard Johnson); ECF No. 20-2 (Declaration of Beth Jordan); ECF No. 25 (Defendants' Opposition to Plaintiffs' Application for a Temporary Restraining Order); and ECF No. 25-2 (List of DOC Supplies).

The government would note that DOC is the entity to whom the defendant should direct any specific request for needed accommodations based on the defendant's particular situation.

In any event, while the government shares the defendant's concerns over the potential risk to the prison population, it remains unclear to undersigned counsel what, if any, precautions this defendant would be able to put in place to protect himself and those around him from COVID-19 if he were to be released. *See United States v. Edwards*, 20-mj-50, at *6 (RMM) (March 30, 2020 D.D.C.) ("Although [the defendant's] alleged health problems may make him at heightened risk if he contracts the coronavirus, he would be at risk even if he were not incarcerated."); *United States v. Washington*, 18-cr-309 (DLF) (D.D.C. Telephonic Conference April 2, 2020) (noting that an asthmatic defendant who is addicted to narcotics and avoided taking his mental health medication may be safer in custody). Moreover, any such circumstances must also protect the public from a dangerous defendant.

Indeed, while reports of positive cases within the Correctional Treatment Facility (CTF) have increased, such reporting would also seem to support a conclusion that steps are being taken to protect the population currently incarcerated there. Specifically, on March 26, 2020, the government learned that DOC reported its first COVID-19 positive test at CTF to the courts. The inmate was immediately placed into isolation and monitored. DOC and the D.C. Department of Health also began to contact trace, to determine who, if any, had contact with the inmate. DOC

has previously handled possible COVID-19 cases with similar procedures.[5] As of April 11, 2020,

the government learned that the total number of positive persons is 51 and all have been placed in

quarantine.[6] All positive inmates are localized to CTF (one inmate was taken to a local hospital

for observation) and are being monitored pursuant to CDC guidelines. Of that group, 9 have fully

recovered. As this Court is likely well aware, the possibility of COVID-19 – a global pandemic –

reaching DOC was always a realistic possibility. But based on the information from DOC, DOC

appears to be taking this pandemic seriously, and complying with D.C. Dept. of Health mandates

regarding how to handle positive tests and symptomatic patients.

It is undeniable that the government and the Court are faced with the difficult challenge—

how to balance the security and safety of the community with the safety of the defendant. The

government is also committed to ensuring the safety all of inmates, regardless of their detention

status. But it is also critical, from the government's perspective, to allow the litigation in *Banks v.*

*Booth* take its course. As noted by Judge Berman Jackson in *United States v. Phillips*, 20-cr-36, at

\*13 (ABJ) (D.D.C. April 10, 2020), the "stark factual disputes [alleged and contested in *Banks*]

will be more appropriately aired and resolved in the context of the civil injunctive action now

pending in this court . . . and based on the limited record before it . . . the Court cannot make a

---

[5] For example, in late March of 2020, a Deputy United States Marshal in D.C. Superior Court tested positive for COVID-19. As a result of this positive test, DOC followed its protocols outlined above. Every inmate who might have been exposed to the deputy was placed in quarantine. Of the quarantined inmates, a single inmate became symptomatic, and later tested negative for COVID-19. The remaining inmates nevertheless remained in quarantine to protect the remainder of DOC's population, until the quarantine was safely lifted.

[6] For reference, as of April 7, 2020, there are 1078 residents at DOC's Central Detention Facility, 418 residents at DOC's Correctional Treatment Facility and 22 residents in halfway houses.

finding that the government has failed to act or has been deliberately indifferent that would completely outweigh the factors set forth in the Bail Reform Act." *Id.* Here, as discussed above, the Bail Reform factors, even taking into consideration the circumstances of COVID-19 and this defendant, remain in favor of detention.

This is not the first time a court has considered bond based on meaningful health emergencies. In *United States v. Johnston*, No. 17-46 (RMM), 2017 WL 4277140 (D.D.C. Sept. 27, 2017), the Court released a defendant for a limited purpose: to obtain surgical treatment. "This is a temporary release to home detention that is narrowly tailored to respond to the exigent and unusual circumstances presented by [the defendant's] cancer diagnosis and the status of his testing and treatment." *Id.* at *9. When the district court has previously reviewed a motion for release from pretrial detention for health conditions that can be treated at the jail, the court denied the motion, citing that a defendant's "history and characteristics" is only one of four factors that the Court must consider in determining the appropriateness of pretrial detention. *United States v. Parker*, 517 F. Supp. 2d 375, 377 (D.D.C. 2007) (defendant's medical conditions, including diabetes, asthma and hypertension, for which he required ongoing medication and treatment, *cannot* be dispositive in considering motion for release).[7]

As defendants continue to ask for release based on COVID-19, courts in this district have begun to assess the validity of the various claims related to COVID-19 or DOC. In *United States v. Smith*, 19-cr-324 (BAH) (D.D.C. March 23, 2020), the Court – the same Court that issued Standing Order 20-9 that suspended most courthouse operations as a result of the pandemic –

---

[7] *See also United States v. Rebollo-Andino*, 312 F. App'x 346, 348 (1st Cir. 2009) (medical conditions can warrant temporary release under § 3142(i)).

remarked that "[t]he risk presented by the pandemic is serious, and the Court acknowledges that risk may be greater in a jail environment . . . ." But the Court also noted that:

> [T]he D.C. Department of Corrections has taken aggressive precautions to prevent the spread of the virus within the facility where defendant is detained . . . including suspending all in-person visits, programming, and volunteer activities within its facilities, enhanced cleaning efforts, especially within common areas, and vigilant medical personnel on alert for symptoms and prepared to isolate and treat symptomatic residents, *see* Department of Corrections Notice, Updated: March 14, 2020, available at https://doc.dc.gov/page/coronavirus-prevention. Although defendant is in an age group that may be more susceptible to the virus . . . this risk pertains whether the defendant were released or detained, and any heightened risk posed by pretrial detention does not outweigh the presumption in favor of detaining the defendant pretrial, nor does it alter the balance of the statutory factors Congress prescribed for determining the propriety of detention, which all continue to weigh heavily in favor of detention.

*Id.* (denying release in a child exploitation case). Judges have previously noted that DOC appears – despite the obvious struggles of a worldwide health crisis – to be tackling this problem. *See, e.g.*, *Lee*, 19-cr-298, at * 11 (noting the "aggressive precautions that DOC appears to have undertaken to prevent the spread of COVID-19 within its facilities"); *United States v. Adams*, 19-cr-257-003, at *3-4 (DKC) (D. Md March 25, 2020) (COVID-19 is not the "kind of extraordinary reason for Mr. Adams' release. The correctional and medical staff at detention facilities continue to provide appropriate safeguards for health and safety of those committed to their custody."); *United States v. Parker II*, 18-cr-344, at *4, 8 (TDC) (D. Md March 21, 2020) (discussing Deputy U.S. Marshal who tested positive for COVID-19, crediting the defendant's alleged health risks [prior aneurysm, prostate cancer, and present diabetes], and noted that the D.C. Department of Corrections "has implemented prophylactic and other measures in response to the COVID-19 virus."). While it is always fair to see, particularly in light of *Banks*, that circumstances may change, the government is committed to informing the court of any known developments related to COVID-19.

The decisions issued by various courts have consistently and clearly illustrated that in assessing the risk (or any particularized risk to a defendant) related to the COVID-19 pandemic, the §3142(g) factors provide the necessary framework to evaluate whether to release an individual who was previously deemed too dangerous or too much of a flight risk to reenter the community.

*See, e.g.*, *United States v. Jacob Jordan*, 20-cr-55 (TFH) (D.D.C. March 23, 2020) (acknowledging the risks associated with COVID but denying release in a guns and drugs case with no prior convictions); *United States v. Gonzalez*, 20-cr-40 (BAH) (D.D.C. March 24, 2020) (denying release, noting the steps taken by DOC to protect inmates); *United States v. Antonio United States v. Whitaker*, 19-cr-351 (DLF) (D.D.C. April 2, 2020) (denying release pending sentencing in a firearms case even though the defendant claimed bronchitis, allergies, and asthma); *United States v. Bailey*, 19-cr-391 (JDB) (denying pretrial release, despite defendant's claim of "complicated medical conditions," noting the applicable §3142 factors); *But see United States v. Mclean*, 19-cr-380 (RDM) (D.D.C. March 28, 2020) (releasing the defendant in a gun and drugs case due to COVID-19, the defendant's prior HISP release orders, and the underlying condition for diabetes); *United States v. Kofi Appiah and James Hutchings Jr.*, 19-cr-361 (BAH) (D.D.C. March 26, 2020) (releasing defendants in a firearms conspiracy case because of underlying health conditions, including severe assault at jail and verified asthma); *United States v. Stephon Davis*, 19-cr-292 (JDB) (D.D.C. April 6, 2020) (granting home confinement in pretrial narcotics conspiracy where defendant had proven acute bronchitis and had limited record with no record of violence); *United States v. Johnson*, 19-cr-52 (TSC) (D.D.C. April 8, 2020) (granting pretrial release in a felon in possession case where defendant had documented medical issues, including

obesity, mobility issues, digestive disorders, and the fact his two prior trials were postponed due to such documented issues).

A close reading of each case suggests that the particulars of the defendant's circumstances guide the analysis. The pandemic, alone, is not a talismanic but-for cause of the defendant's release, even under 18 U.S.C. § 3142(i).[8]

Finally, while the COVID-19 virus is new, arguments based primarily on health concerns are not. Courts have generally recognized that "it is a rare case in which health conditions present an exceptional reason" to allow for release where otherwise detention would be warranted. *United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008) (quotations omitted). As noted by the government as it continues to assess vulnerable defendants on a case-by-case basis for temporary release, the Bureau of Prisons (BOP) is similarly assessing its low-risk, non-violent offenders for release, but through meaningful scrutiny.[9]

---

[8] *See also United States v. Cox*, No. 19-cr-271, 2020 WL 1491180 (D. Nev. Mar. 27, 2020); *United States v. Green*, No. 19-cr-304, 2020 WL 1477679 (M.D. Fla. Mar. 26, 2020); *United States v. Steward*, No. 20-cr-52, 2020 WL 1468005 (S.D.N.Y. Mar. 26, 2020); *United States v. Hamilton*, No. 19-cr-54, 2020 WL 1323036 (E.D.N.Y. Mar. 20, 2020).

[9] *See* The U.S. Attorney General's March 26, 2020 memorandum related to the "Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic." As described by BOP, "there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities." *Id.* As part of the analysis in assessing whether inmates should be granted home confinement, BOP was encouraged to look at, among other factors, the "age and vulnerability" of the inmate; the inmate's criminal history; whether the inmate has "demonstrated a verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions . . . upon release would present a lower risk of contracting COVID-19 than . . . in his or her BOP facility"; and the assessment of the danger posed by the inmate to the community. *Id.* The government's filing does just that. Notably, the March 26, 2020 memorandum also counsels that "before granting any inmate discretionary release, the BOP *Medical Director* . . . will, based on CDC guidance, make an assessment of the inmate's risk factors for *severe* COVID-19 illness*, risks of COVID-19 at the . . . facility, as well as the risks of COVID-19 at the location in which the inmate seeks home

The government appreciates the gravity of this global pandemic and is committed to ensuring the safety and health of inmates like the defendant. But at this stage and at this time, based on the information provided by DOC, DOC appears dedicated and willing to address this public health crisis. Whether the Court analyzes this case under the "compelling reason" language of 18 U.S.C. § 3142(i) or the "exceptional reason" standard of 18 U.S.C. § 3145(c), the defendant cannot demonstrate that his release benefits the community. Moreover, the existence of the COVID-19 pandemic can certainly factor into this analysis, but it cannot be dispositive, without more. Thousands upon thousands of Americans will be affected by this crisis, both inside and outside of detention facilities. The inquiry before this Court, today, is whether the Court can trust the defendant's safe return to Court regardless. Respectfully, that answer is no.

## **CONCLUSION**

Given the plans in place at the DOC and the danger that the defendant represents to the community – the same community also affected by this illness, the government respectfully requests that this Court deny the motion. The Government further requests that the Court schedule a sentencing hearing at the earliest available date.

Respectfully submitted,

TIMOTHY J. SHEA
United States Attorney
D.C. Bar No. 437437

By: ____/s/_____

---

confinement." *Id.* (Emphasis Added). The defendant's request generally summarizes the risk of COVID-19, but in no way establishes the high bar described above, and how his placement in the community would benefit both him *and* the community.

Kevin L. Rosenberg
Ohio Bar 0081448
Assistant United States Attorney
Violent Crime and Narcotics Trafficking
Section
555 4th Street, N.W., 4122
Washington, D.C. 20530
202-809-5351
Kevin.Rosenberg@usdoj.gov

Dated: May 1, 2020